**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

EQUAL EMPLOYMENT OPPORTUNITY )
COMMISSION,                    )
                               )
                Plaintiff,     )
                               )
            and                )        Civil Action No. 06-01210
                               )        Judge Nora Barry Fischer
KIMBERLY A. BLOOM,             )
                               )
            Plaintiff-Intervenor, )
                               )
            v.                 )
                               )
ALDI, INCORPORATED,            )
                               )
                Defendant.     )

**MEMORANDUM OPINION**

Presently before this Court are Plaintiff Equal Employment Opportunity Commission's ("EEOC") and Plaintiff-Intervenor Kimberly Bloom's ("Bloom") (collectively "Plaintiffs") Renewed Motions for Judgment as a Matter of Law and Motions for New Trial. (Docket Nos. 162 and 166). The motions are fully briefed and the Court heard oral argument regarding them on August 14, 2009. After consideration of the parties' submissions and oral arguments, and for the reasons set forth herein, the Court DENIES Plaintiffs' motions.

**I.      FACTUAL BACKGROUND**[1]

Plaintiff Bloom describes herself as a Born Again Christian, and claims that her former employer, Aldi, Incorporated ("Aldi"), failed to accommodate her religious belief that it is a sin to

---

[1] The facts as described are those that are uncontested by either party, unless otherwise noted.

work on the Sabbath, which, in accordance with her religious beliefs, falls on Sunday.  The EEOC brought this action against Aldi for alleged discrimination in employment based on religion and for retaliation, both in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e-2(a)(1) and 2000e-3(a) ("Title VII") and the Pennsylvania Human Relations Act, 43 P.S. §§ 955 and 963(c) ("PHRA").[2]

At all times relevant to the instant litigation, Kelli Cooper was the Store Manager of Aldi's Uniontown, Pennsylvnia location.  (Docket No. 49, at ¶ 24; Docket No. 55, at ¶ 55; Docket No. 178, at 38).  Pam Conn and Christy Shimko were employed as shift managers at Aldi's Uniontown location.  (Docket No. 49, at ¶¶ 25-26; Docket No. 49, at ¶¶ 25-26).  Cooper reported to Theresa Salandra, Aldi's District Manager who supervised four Aldi locations in Pennsylvania and West Virginia. (Docket No. 49, at ¶ 21; Docket No. 55, at ¶ 21).  As District Manager, Salandra reported to Kim Anderson who was, at all relevant times, employed as Aldi's Director of Store Operations.  As Director of Store Operations, Anderson oversaw operations at Aldi locations in Western Pennsylvania, Northern Ohio, and New York.  (Docket No. 49, at ¶¶ 22-23; Docket No. 55, at ¶¶ 22-23).

Bloom was hired as a casual cashier at Aldi's Uniontown location on November 5, 1998.  (Docket No. 40, at ¶ 4; Docket No. 50, at ¶ 4).[3]  Aldi employs two types of cashiers: casual and permanent part-time.  (Docket No. 56, at ¶ 51; Docket No. 60, at ¶ 51).  Casual cashiers work less

---

[2]

Title VII and the PHRA are substantially similar, and Pennsylvania courts generally interpret the PHRA consistently with Title VII.  *See Weston v. Commonwealth of Pennsylvania*, 251 F3d 420, 425 n.3 (3d Cir. 2001) ("The proper analysis under Title VII and the [PHRA] is identical as Pennsylvania courts have construed the acts interchangeably.")

[3]

In 2001, Bloom's status changed to permanent part-time until 2002, when her status changed back to casual cashier.  She remained a casual cashier from 2002 until her termination in 2006. (Docket No. 176, at 148).

than twenty hours per week, while permanent part-time cashiers work more than twenty, but less than forty hours per week.  (Docket No. 56, at ¶ 51; Docket No. 60, at ¶ 51).  Additionally, casual cashiers are expected to work "as needed," meaning that, as a casual cashier, Bloom's schedule "fluctuated depending on how busy the store manager estimated the Uniontown store would be during that particular week."  (Docket No. 40, at ¶ 7; Docket No, 50, at ¶ 7).  At any particular time, Aldi stores, including the Uniontown location, are staffed with one or two cashiers.  (Docket No. 40, at ¶ 3; Docket No. 50, at ¶ 3).

Casual and part-time cashiers are responsible for essentially the same duties, including operating registers, cleaning, and stocking.  (Docket No. 41, Exh. C, at 84; Docket No. 40, at ¶ 6).  The responsibilities of Aldi employees were laid out in the Aldi Employee Handbook (Tr. Exh. J-7).  The Aldi attendance and  punctuality policy required all cashiers to show up for their shifts and to be available to work their scheduled shifts between 6:00 a.m. and 10:00 p.m. (Docket No. 176, at 141).  The policy also provided for a mechanism by which cashiers could "call off" by notifying the manager of their inability to work due to "illness or other emergency reasons."  (Docket No. 176, at 140-42).  Informally, a store manager might try to accommodate particular scheduling preferences but such accommodations were temporary and not guaranteed, and in some cases were accompanied by informal understandings that others would be available to cover the shifts.  For example, Cooper worked out temporary, non-guaranteed scheduling arrangements for other cashiers while Bloom was employed at Aldi, including allowing a casual cashier to work only on weekends for a brief period.  (Docket No. 178, at 46, 79)   Cooper had similarly tried to honor Bloom's requests when she said that she prefered not to be scheduled on Wednesdays, Thursdays, or Saturdays.  (Docket No.178, at 42).  Other Aldi District Managers scheduled around a variety of conflicts including an employee who played in a band on the weekend, and one who was full-time student who could not work during

3

the week.  (Docket No. 176, at 206-214).  Alternately, cashiers could "swap" shifts with one another,

a regular practice that Aldi management routinely approved.  (Docket No. 176, at 142-43).  At least

one Uniontown employee used the swap system to swap for a Sunday shift, although she did so only

after Bloom was no longer employed at Aldi, and she traded her Sunday shift for another Sunday

shift.  (Docket No. 178, at 82).  The parties agree that before the events underlying this litigation,

Bloom was a model employee with no employment problems.  (Docket No. 176, at 37).

     In 2005, faced with competition from stores that were open on Sundays, Aldi stores,

including the Uniontown store, began operating on Sundays.  (Docket No. 176, at 150).  At a district

managers' meeting in August of 2005, Anderson discussed with the district managers the importance

of smoothly implementing the new Sunday store operations policy.  (Docket No. 176, at 153-55).

Anticipating employee's religious needs, Anderson told the managers that they could schedule

employees so that they could attend religious services. (Docket No. 176, at 153).  She also told them

that any other requests for religious accommodation should be brought directly to her.  (Docket No.

176, at 154-55).  At that same meeting, Salandra suggested implementing a neutral rotation system

for Sundays.  (Docket No. 178, at 159).  Subsequently, Salandra and Cooper decided that when the

Uniontown store opened on Sundays they would implement the neutral rotation system, scheduling

each cashier to work approximately six to eight Sundays per year.  (Docket No. 178, at 159).  During

the fall of 2005, rumors circulated among the employees at the Uniontown store that the store would

soon start opening on Sundays, and in November a sign was posted in the store window announcing

the change.  (Docket No. 177, at 59).  That same fall, Cooper, the Uniontown Store Manager, was

working at another Aldi store out-of-state, and she did not return until the end November.  (Docket

No. 178, at 57, 92).  Many of the employees at the Uniontown store were unhappy with the Sunday

openings and a number complained to Salandra and to Cooper once she had returned to her store.

(Docket No. 178, at 163, 58).  There was no formal announcement or meeting held at that time to apprise Aldi's Uniontown employees of the new hours policy.  (Docket No. 178, at 93).

In November of 2005, Bloom informed management at Aldi, specifically Salandra, that she was unable to work Sundays because of her religious beliefs.  (Docket No. 177, at 60; Docket No. 178, at 174).[4]  According to Bloom, during the course of this conversation, she explained her religious beliefs to Salandra, specifically regarding her belief that work on Sundays constitutes a sin.  (Docket No. 177, at 60).  In response, Salandra informed Bloom that she would discuss the request to not work Sundays with her immediate supervisor, Kim Anderson.  (Docket No. 177 at 60; Docket No. 178, at 175).  Salandra subsequently discussed Bloom's request along with the general complaints from many of the Uniontown employees with Anderson.  (Docket No. 178, at 175-79).

Bloom also contends that subsequent to this meeting with Salandra, she informed Cooper, her immediate supervisor, that she would be unable to work on Sundays due to her religious beliefs and that neither Salandra nor Cooper ever addressed the matter with Bloom after these conversations.  (Docket No. 177, at 62-3).  Aldi denies that Bloom ever discussed her inability to work on Sundays with Cooper. (Docket No. 178, at 48).  The parties agree, however, that Bloom was then scheduled to work Sunday, January 22, 2006. (Docket No. 49, at ¶ 77; Docket No. 55, at ¶ 77).

On January 12, 2006 Bloom contacted Salandra because she had been scheduled to work on an upcoming Sunday.  (Docket No. 178, at 181-82).  Salandra spoke to her manager, Kim Anderson, on January 13, 2006 and then met with Bloom on the 14th or the 17th.  (Docket No. 177, at 63;

---

[4]

    Bloom claims that she had informed her employer of her beliefs prior to the announcement of the new policy as well: once when she was hired–when it was not an issue because Aldi was not open on Sundays–and on two other occasions when extra work needed to be done on Sundays–from which she was excused. (Docket No. 177, at 49-50).  In the course of this litigation, Bloom has also claimed that she considers it a sin to *ask others* to work on Sunday, but she did not inform Aldi of this belief while she was employed there.  (Docket No. 177, at 119).

Docket No. 178, at 181-82).  The parties dispute the date and the contents of this conversation.  In the course of this conversation, Bloom again informed Salandra that she would be unable to work on Sundays because of her religious convictions.  (Docket No. 41, Exh. L, at 37; Docket No. 178, at 183).  Aldi contends that, during this conversation, Salandra informed Bloom that an "essential job function of an Aldi cashier is being available seven days a week" and that "Aldi can't give preferential treatment to one employee."  (Docket No. 178, at 165).  Bloom testified that, during this meeting, Salandra informed her that she was required to work Sundays, regardless of her religious convictions, that Aldi had concluded that they did "not have to accommodate [her] religious request," and that she had three choices: "either you work Sunday, you quit, or you're going to be fired."  (Docket No. 177, at 63).  The parties agree, however, that during the course of Bloom's meeting with Salandra, Salandra offered to allow Bloom time off on Sunday mornings to attend church or other observation, but that Bloom would not be permitted to never work on Sunday. (Docket No. 49, at ¶ 86; Docket No. 55, at ¶ 86).

Bloom maintains that on Friday, January 20, 2006, she visited the Uniontown store in order to inform Christy Shimko, the manager on duty, that she would not be working that Sunday. (Docket No. 49, at ¶ 88, Docket No. 177, at 64).  Aldi contends that, while Bloom did discuss her Sunday shift with Shimko on January 20, Shimko did not take Bloom off the schedule because at that time Bloom had not properly "called off."  (Docket No. 41, Exh. 10, at 7).  Bloom claims that she then called Cooper on Saturday, January 21, 2006, to inform Cooper that she, Bloom, would not be coming to work on January 22 because of her religious beliefs and that, on that same date, Aldi scheduled another cashier to work on Sunday. (Docket No. 177, at 64-5).  Aldi claims that although Cooper understood from this conversation that Bloom might not be reporting for work on Sunday, January 22, she still did not think that Bloom had officially "called off" from work. (Docket No. 41,

Exh. 10, at 7; Docket No. 178, at 50). The parties agree that, on Sunday, January 22, Bloom did not report to work.  (Docket No. 40, at ¶ 76; Docket No. 50, at ¶ 76).

On Monday, January 23, 2006, Salandra called Bloom to schedule a meeting with her on January 27 in order "to discuss [Bloom's] failure to work her scheduled Sunday shift." (Docket No. 40, at ¶79, Docket No. 50, at ¶ 79, Docket No 177, at 65).  At that meeting, Bloom claims that Salandra told her that "just because [she] was more religious than others, that didn't mean anything . . . to Aldi USA." (Docket No. 177, at 67).  Both Bloom and Aldi agree that swapping shifts was not mentioned explicitly at the meeting. (Docket No. 177, at 8, Docket No. 178, at 166).  Aldi suggests that during the course of this discussion, Bloom knew and understood that she had the option of "swapping" shifts with another cashier. (Docket No. 40, at ¶ 80; Docket No. 50, at ¶ 80). Bloom contends that she was given the impression that swapping was not available for Sundays and that "if somebody did cover for me, if I would have switched or covered for someone, however I missed my Sunday, I was going to be scheduled for the very next Sunday."  (Docket No. 177, at 68-9).

Thereafter, by letter dated January 31, 2006, Bloom informed Salandra that working on Sunday violated her religious beliefs and she requested that Aldi accommodate her request that she not be scheduled to work on Sundays. (Docket No. 51, Exh. 18).  In the letter, Bloom suggests possible accommodations, including that instead of Sundays, she be scheduled to work holidays or other days of the week.  *Id.* Bloom claims that after she delivered the letter to Salandra's box at the Uniontown store, she spoke to her on the phone and Salandra said that she would get back in touch with her but never did.  (Docket No. 177, at 70).  The parties agree that over the course of all of these meetings, no one from Aldi ever explicitly informed Bloom that she could swap shifts on Sundays. (Docket No. 177, at 68; Docket No.178, at 172)

Bloom was next scheduled to work on Sunday, February 5, 2006. (Docket No. 56, at ¶ 10; Docket No. 60, at ¶ 10). On Saturday, February 4, 2006, Bloom called Cooper to inform her that she, Bloom, did not intend to show up for work on Sunday, February 5. (Docket No. 40, at ¶ 84; Docket No. 50, at ¶ 85).[5] Aldi contends that, at the end of the conversation, Cooper did not understand whether or not Bloom would be showing up for work on February 5 and concluded that Bloom had not properly "called off." (Docket No. 41, Exh.10, at 7). The parties do not dispute that Bloom did not work on Sunday, February 5. (Docket No. 40, at ¶ 89; Docket No. 50, at ¶ 89).

On February 7, 2006, Bloom met with Salandra and Cooper at their request, who, in the course of this meeting, terminated Bloom's employment. (Docket No. 40, at ¶ 91; Docket No. 50, at ¶ 91). Aldi contends that Bloom was terminated for failure to perform an "essential job function" because she did not show up for work on two separate occasions. (Docket No. 40, at ¶ 91). Bloom, however, contends that Aldi did not terminate her based upon her failure to perform an essential job function. (Docket No. 50, at ¶ 91). Rather, Bloom avers that Aldi failed to accommodate her religious beliefs and then retaliated against her by discharging her when she refused to work on Sunday. (Docket No. 31, at 3-6).

## II.   PROCEDURAL BACKGROUND

On September 11, 2006, the EEOC commenced the instant action by filing a Complaint (with jury demand) against Aldi pursuant to Title VII of the Civil Rights Act of 1964 and Title I of the of the Civil Rights Act of 1991in order "to correct unlawful employment on the basis of religion and

---

[5]

The nature of these conversations between Bloom and Cooper are largely in dispute. Bloom contends that Cooper made several requests that Bloom reconsider her position regarding Sundays, including offering her full-time work and suggesting that she speak to her father, a preacher about these circumstances. (*See* Docket No. 50, Exh. 2, Docket No. 177, at 71-2).

to provide appropriate relief to Kimberly A. Bloom who was adversely affected by such practices."
(Docket No. 1).  On September 15, 2006, Kimberly A. Bloom filed a Motion to Intervene as of
Right, which the Court granted on October 16, 2006.  On October 13, 2006, Defendant Aldi filed
its Answer.  On October 17, 2006, Bloom filed her Complaint in Intervention, in which she joined
Plaintiff EEOC in seeking legal and equitable relief and also asserted her own claims for religious
discrimination and retaliation pursuant to Title VII, 42 U.S.C. §§ 2000e-2(a)(1) & 2000e-3(a),
respectively. On March 28, 2007, Bloom filed an Amended Complaint in Intervention, in which,
based on the same set of facts, she added a third count for religious discrimination and retaliation
in violation of the PHRA.  (Docket No. 31).

On June 25, 2007, Defendant filed a motion for summary judgment (Docket No. 38).  After
extensive briefing, this Court entered an order and opinion denying the motion for summary
judgment in all respects on March 28, 2008.  (Docket No. 67, 68).  *E.E.O.C. v. Aldi, Inc.*, Civ. A.
No. 06-01210, 2008 WL 5429624 (W.D.Pa., Mar. 28, 2008).

A trial was held from January 6, 2009 to January 9, 2009.  Following Plaintiffs' case-in-chief,
Defendant moved for a directed verdict pursuant to Federal Rule of Civil Procedure 50.  (Docket no.
177, at 170).  The Court denied the motion, finding: (1) that the sincerity of Bloom's religious beliefs
was a credibility question for the jury (Docket No. 178, at 7); (2) that Plaintiff had introduced
sufficient evidence for a reasonable jury to find that Aldi had not made a reasonable accommodation
(*Id*. at 12); (3) that Plaintiff had introduced sufficient evidence for a reasonable jury to find that
Aldi's proffered reasons for dismissing her were pretextual (*Id*. at 16); (4) that Defendant had not
established that it would suffer an undue hardship by accommodating Bloom as a matter of law (*Id*.
at 18); and (5) that Defendant had not established that it should be exempted from a potential
punitive damages claim because it had made a good faith effort to comply with Title VII.  At the

conclusion of all evidence, Defendant renewed its Rule 50 motion and Plaintiffs moved for a Rule 50 judgment as a matter of law on the failure to accommodate claim. (Docket No. 178 at 229-242). The Court denied both parties' motions, finding that the issues presented questions of fact and credibility for the jury to determine (Docket No. 179 at 2-17).

On a special verdict form, the jury found that Bloom had a sincerely held religious belief that conflicted with a job requirement at Aldi, but that Aldi reasonably accommodated her religious beliefs. (Docket No. 160). The jury further found that Bloom's religious beliefs were not a determinative factor in Aldi's decision to terminate her, nor was her request for a religious accommodation. (*Id.*)

Thereafter, on January 12, 2009, Bloom renewed her motion for Judgment as a Matter of Law and also moved for a new trial. (Docket No. 162). On January 15, 2009, the EEOC joined Bloom in said motions. (Docket No. 166). The parties' briefing on the motions concluded on April 27, 2009 and oral argument was held August 14, 2009.[6] (Docket No. 204).

Accordingly, the motions are ripe for disposition.

III.    **LEGAL STANDARD**

A.      ***Motion for Judgment as a Matter of Law***

A motion for judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50 should be granted only if, viewing the evidence in a light most favorable to the non-movant and granting the non-movant all reasonable inferences, "there is no legally sufficient evidentiary basis

---

[6]     Oral argument had originally been scheduled for May 29, 2009, but was rescheduled due to an ongoing trial. (Docket Nos. 200, 204).

for a reasonable jury to find for that party on that issue." FED.R.CIV.P. 50(a)(1); *see also Caver v. City of Trenton*, 420 F.3d 243, 262 (3d Cir. 2005). "The question is not whether there is literally no evidence supporting the unsuccessful party, but whether there is evidence upon which a reasonable jury could properly have found its verdict." *Eshelman v. Agere Sys. Inc.*, 554 F. 3d 426, 433 (3d Cir. 2009)(quoting *Gomez v. Allegheny Health Servs., Inc.*, 71 F.3d 1079, 1083 (3d Cir. 1995)). Judgment as a matter of law should be granted sparingly; however, it should be granted where the record is "critically deficient of the minimum quantum of evidence" in support of the verdict. *Id.* When determining whether the evidence is sufficient to sustain liability, the court may not weigh the evidence, determine the credibility of witnesses, or substitute its own version of the facts for the jury's. *Eshelman*, 554 F. 3d at 433.

### B.    *Motion for New Trial*

A motion for a new trial pursuant to Federal Rule of Civil Procedure 59 can be granted "to all or any of the parties and on all or part of the issues in an action in which there has been a trial by jury" FED.R.CIV.P. 59(a). The court is also "empowered to order a new trial on its own initiative 'for any reason that would justify granting one on a party's motion.'" *Pryer v. C.O. 3 Slavic*, 251 F.3d 448, 453 (3d Cir. 2001)(quoting FED.R.CIV.P. 59(d)). A new trial is most commonly granted in select situations, including: (1) when the jury's verdict is against the clear weight of the evidence; (2) when new evidence surfaces that would have altered the outcome of the trial; (3) when improper conduct on the part of an attorney or the court unfairly influenced the verdict; or (4) where the jury's verdict was facially inconsistent. *Davis v. Mountaire Farms, Inc.*, 598 F.Supp.2d 582, 587 (D.Del. 2009).

The court's level of discretion varies, depending on the type of error alleged. *Moussa v. Commonwealth of Penn. Dep't of Pub. Welfare*, 289 F.Supp.2d 639, 648 (W.D.Pa. 2003)(citing

*Klein v. Hollings*, 992 F.2d 1285, 1289-90 (3d Cir. 1993)).  When the motion for a new trial is based

on the claim that the verdict is against the clear weight of the evidence, the court's discretion is

highly limited: the verdict must be "contrary to the great weight of the evidence; that is, where a

miscarriage of justice would result if the verdict were to stand."  *Pryer*, 251 F.3d at 453.  And, a

verdict may not be set aside when there is a plausible or rational basis for the decision.  *Moussa*, 289

F.Supp.2d at 648.  The court must not substitute its own judgment of the facts and assessment of the

witnesses' credibility for the jury's.  *Davis*, 598 F.Supp.2d at 587.   When the basis for the motion

is an alleged error on the part of the court, such as an error in jury instructions, a district court must

first determine whether an error was made, i.e. "whether, taken as a whole, the instruction, properly

apprised the jury of the issues and the applicable law" *Donlin v. Philips Lighting N. America Corp.*,

2009 WL 2871216, 2 (3d. Cir. Sep. 9, 2009), and must then determine "whether that error was so

prejudicial that refusal to grant a new trial would be 'inconsistent with substantial justice.'"  *Bhaya

v. Westinghouse Elec. Corp.*, 709 F.Supp. 600, 601 (E.D. Pa. 1989)(quoting FED.R.CIV.P. 61).[7]


## IV.    DISCUSSION

### A.    *Motion for Judgment as Matter of Law – Religious Accommodation Claim (failure to accommodate)*

The jury found that Aldi reasonably accommodated Bloom's religious beliefs regarding work

on Sundays.  (Docket No. 160).  The EEOC and Bloom contend that Aldi presented no evidence that

it offered Bloom a reasonable accommodation for her religious conflict, and, therefore, they should

be granted judgment as a matter of law on this issue.  (Docket No. 189 at 15; Docket No 190 at 6).

Aldi counters that three reasonable accommodations were available to Bloom that, taken together,

---

[7]

  Plaintiff does not allege that new evidence has surfaced or that the jury's verdict is facially inconsistent, so the Court will not discuss those standards.

would have eliminated Bloom's conflict, namely: "a neutral rotation system that would require her to work only every 7th or 8th Sunday, the ability to be scheduled around a religious service or practice, and the ability to swap her Sunday shifts."  (Docket No. 195 at 4-5).

Under Title VII and the PHRA, it is illegal for an employer to discriminate against an individual with respect to compensation, terms, conditions, or privileges of employment on the basis of religion. *See* 42 U.S.C. § 2000e-2(a); 43 P.S. § 955(a).  If the employee establishes a prima facie case, the burden shifts to the employer to demonstrate that it made a good faith effort to accommodate the employee's religion or that the requested accommodation would work an undue hardship on the employer. *Shelton v. University of Medicine & Dentistry of New Jersey*, 223 F.3d at 224-25 (3d Cir. 2000).  Under Title VII,

> [t]he term religion includes all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate to an employee's or prospective employee's religious observance or practice without undue hardship on the conduct of the employer's business.

42 U.S.C. § 2000e(j).  "The intent and effect of this definition was to make it an unlawful employment practice . . . for an employer not to make reasonable accommodations, short of undue hardship, for the religious practices of his employees and prospective employees."  *Trans World Airlines v. Hardison*, 432 U.S. 63, 74 (1977).

Plaintiffs contend that Aldi's affirmative defense of reasonable accommodation fails as a matter of law because none of the offered accommodations addressed Bloom's religious conflict. (Docket No. 189 at 9).  Specifically, Plaintiffs argue that allowing Bloom time off to attend services was not a reasonable accommodation as she did not attend services and believed it was a sin to work at any time on Sunday. (*Id*.).  In regard to the neutral rotation system, Plaintiffs maintain that this

system was not a reasonable accommodation in that it would have required Bloom to sin "6-7 or 8 times a year." (*Id.*).  Finally, as to Aldi's policy allowing employees to swap Sunday shifts, Plaintiffs contend that because this option was never offered to Bloom, it cannot be considered a reasonable accommodation.  (*Id.*).

The Court agrees with Plaintiffs' argument that Aldi's offer to allow Bloom time off on Sunday to attend religious services is not a reasonable accommodation as a matter of law.  Once Defendant was made aware that the religious conflict was not related to religious services, but rather to Plaintiff's belief that working at any time on Sunday was a sin, offering her an accommodation that did not address much less eliminate the conflict was not a reasonable accommodation.  *See Ansonia Bd. of Educ. v. Philbrook*, 479 U.S. 60, 70 (1986).[8]  Similarly, Defendant's neutral rotation

---

[8]

*See also Schwartzberg v. Mellon Bank, N.A.*, Civ. A. No.06-1006, 2008 WL 111984 (W.D.Pa. 2008), *aff'd* 307 Fed. Appx. 676 (3d Cir. 2009) (citing *Philbrook* and providing that "[a]ny reasonable accommodation is sufficient to meet an employer's obligation under Title VII, as long as it 'eliminates the conflict between employment requirements and religious practices.'").  Numerous courts have interpreted *Philbrook* as requiring that a proposed accommodation eliminate the conflict, however the United States Court of Appeals for the Third Circuit has not expressly held as much.  *See Morrisette-Brown v. Mobile Infirmary Medical Center*, 506 F.3d 1317, 1322 (11th Cir. 2007) (citing *Philbrook* and providing that "the Supreme Court has explained that a reasonable accommodation is one that 'eliminates the conflict between employment requirements and religious practices'") (citation omitted); *Baker v. Home Depot*, 445 F.3d 541, 548 (2d Cir. 2006); *Cosme v. Henderson*, 287 F.3d 152, 159 (2d Cir. 2002) (reviewing the purported accommodations and providing that "[f]or any of these offers to have been reasonable within the meaning of § 701(j), the proposed accommodation had to have eliminated the conflict between the employment requirement, working on Saturdays, and the employee's religious practice of not working on the Saturday Sabbath"); *Wright v. Runyon*, 2 F.3d 214, 217 (7th Cir. 1993) (quoting *Philbrook*, 479 U.S. 60, 70 (1986) ("A reasonable accommodation of an employee's religion is one that "eliminates the conflict between employment requirements and religious practices ...")); *EEOC v. Ilona of Hungary, Inc.*, 108 F.3d 1569, 1576 (7th Cir. 1996) ("The offered accommodation cannot be considered reasonable, however, because it does not eliminate the conflict between the employment requirement and the religious practice"); *but see Sturgill v. United Parcel Service, Inc.*, 512 F.3d 1024, 1032-33 (8th Cir. 2008) (declining "to follow the few decisions in other circuits declaring that a "reasonable" accommodation must eliminate any religion-work conflict" and concluding "that the district court erred in instructing the jury that a reasonable accommodation must eliminate the religious conflict, an instruction that improperly took that issue from the jury").

system still required Plaintiff to work on Sundays and thus did not address the conflict and was not a reasonable accommodation. *Id.* However, the Court does not agree with Plaintiffs' contention that Aldi's affirmative defense of reasonable accommodation fails as a matter of law because Aldi did not explicitly re-offer the option of swapping Sunday shifts to Bloom after she requested an accommodation, but rather relied on its pre-existing policy of allowing employees to swap shifts.

At the summary judgment stage, this Court declined to hold as a *per se* rule that an employer must react or take action in response to an employee's religious beliefs in order to meet its burden under Title VII.  (Docket No. 67 at 17). As the Court explained at that stage, the very nature of the inquiry on a failure to accommodate claim under Title VII does not lend itself to the application of a hard and fast rule.  *See Smith v. Pyro Mining Company*, 827 F.2d 1081, 1085 (6th Cir. 1987) ("The reasonableness of an employer's attempt at accommodation cannot be determined in a vacuum. Instead, it must be determined on a case-by-case basis; what may be a reasonable accommodation for one employee may not be reasonable for another"); *Redmond v. GAF Corp.*, 574 F.2d 897, 902-03 (7th Cir.1978) ("The term 'reasonable accommodation' is a relative term and cannot be given a hard and fast meaning.  Each case involving such a determination necessarily depends upon its own facts and circumstances, and comes down to a determination of 'reasonableness' under the unique circumstances of the individual employer-employee relationship. The trier of fact is in the best position to weigh these considerations"); *United States v. City of Albuquerque*,  545 F.2d 110, 114 (10th Cir. 1976) ("Each case necessarily depends upon its own facts and circumstances, and in a sense every case boils down to a determination as to whether the employer has acted reasonably"). Just as at the summary judgment stage the Court refused to adopt a rule that an employer *must not just* rely on a pre-existing swap policy as a reasonable accommodation as a matter of law, the Court now refuses to adopt the rule that an employer *cannot just* rely on a pre-existing swap policy as a

matter of law.

The EEOC's guidelines outline what an employer must do for a swap system to be considered a reasonable accommodation, and they do not require an employer to reiterate existing, well-known policies that are already in place:

> (I) Voluntary Substitutes and "Swaps."
> Reasonable accommodation without undue hardship is generally possible where a voluntary substitute with substantially similar qualifications is available. One means of substitution is the voluntary swap. In a number of cases, the securing of a substitute has been left entirely up to the individual seeking the accommodation. The Commission believes that the obligation to accommodate requires that employers and labor organizations facilitate the securing of a voluntary substitute with substantially similar qualifications. Some means of doing this which employers and labor organizations should consider are: to publicize policies regarding accommodation and voluntary substitution; to promote an atmosphere in which such substitutions are favorably regarded; to provide a central file, bulletin board or other means for matching voluntary substitutes with positions for which substitutes are needed.

29 C.F.R. § 1605.2(d)(1)(I) (emphasis added).

Here, there was a great deal of evidence from which the jury could infer that Aldi had "facilitate[d] the securing of a voluntary substitutes" by promoting an "atmosphere in which such substitutions were favorably regarded." *Id*. Specifically, several employees, including Bloom, testified that they engaged in the swap on several occasions. In fact, Bloom admitted that she could not recall any time in which Aldi management denied her a swap. (Docket No. 177 at 108). Bloom also testified that she was aware of the swapping system, used it often, and used it the very same week she did not attempt to swap her Sunday shift. (Docket No. 177 at 109 and 147). And, other Aldi employees testified that they swapped for Sundays. (Docket No. 177 at 201-03). Furthermore, Anderson testified that Aldi's management attempted to facilitate swaps by posting schedules a week ahead of time in the employee break room and checking the schedule for potential swap partners. (Docket No. 176 at 142-43).

Plaintiffs' attempts to frame this issue as a pure question of law are unpersuasive for the

following reasons.  Bloom was aware of and had utilized the swapping system.  Bloom testified she did not attempt to take someone else's shift when she was scheduled for Sunday because Salandra told her "either you work Sunday, you quit, or you're going to be fired. I said, can't I take somebody else's shift? She said, no, those are your three choices, you have to work Sunday." (Docket No. 177 at 63).  Although Bloom testified that the reason she did not ask for this accommodation is because Salandra only gave her those three options, Cooper and Salandra have testified that Salandra never made that statement.  (Docket No. 178, at 109, 166).  These disputes amount to credibility determinations to be made by the jury. *See Reeves v. Sanderson Plumbing Products, Inc.*,  530 U.S. 133, 150-51 (2000) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 254 (1986) ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge.").  Therefore, Plaintiffs' motion for judgment as a matter of law on the question of reasonable accommodation is denied.

### B.    Motion for a New Trial – Weight of the Evidence

Plaintiffs argue that even if the Court does not find that Aldi's affirmative defense of reasonable accommodation fails as a matter of law, the Court should grant a new trial because the verdict was against the clear weight of the evidence on this issue. (Docket No. 189 at 21).  However, although the Plaintiffs state that the jury's findings must have required the jury to make "an extraordinary number of inferences" (Docket No. 189, at 21), there is nothing extraordinary about the credibility determinations outlined above or the common sense inference that Bloom could have availed herself of the pre-existing swap policy, whether she was specifically informed of it or not after her request for an accommodation.[9]  In other words, there was a plausible or rational basis for

---

[9]

Regarding inferences, the jury was instructed as follows:

Once you have considered the uncontested facts, you will then proceed to resolve the

17

the decision. *Moussa*, 289 F. Supp.2d at 648. Therefore, Plaintiffs' motion for a new trial due to the weight of the evidence is denied.

### C.       *Motion for New Trial – Jury Instructions*

#### 1.       Determinative v. Motivating Factor

Plaintiffs contend that the Court erred by instructing the jury that Bloom's burden of proof required her to show that her religion was a "determinative factor" in Aldi's decision to discharge her. (Docket No. 190 at 11). Plaintiffs maintain that the jury instruction should have instead asked the jury whether her religion was a "motivating factor." *Id*.

The Court will first address whether there was an error and then, if necessary, whether the error was inconsistent with substantial justice. *Bhaya*, 709 F. Supp. at 601 (E.D. Pa. 1989). Plaintiffs argue that in *Desert Palace Inc. v. Costa*, 539 U.S. 90 (2003) the Supreme Court of the United States did away with the distinction between pretext cases brought under 42 U.S.C. § 2000e-2(a) and "mixed motive" cases brought under 42 U.S.C. § 2000e-2(m). (Docket No. 190 at 11). But, Plaintiffs' contention overstates the holding of *Desert Palace* by conflating two distinct questions: (1) the type of evidence required for each case, and (2) the instructions to the jury regarding the Defendant's rationale in each one.

In *Price Waterhouse v. Hopkins*, 490 U.S. 228, 233 (1989), the Supreme Court of the United States first addressed the issue of "mixed-motive" cases when it held that in cases where both

---

facts and inferences which are disputed. You are permitted to draw such reasonable inferences from the testimony and exhibits as are justified in the light of common experience.

    Inferences are deductions or conclusions which reason and common sense lead you to draw from facts which have been established by the evidence in the case. In other words, you may reach conclusions which reason and common sense lead you to reach from the facts which have been established by the evidence in this case.

(Docket No. 179, at 136-37). Neither party objected to this instruction.

discriminatory and non-discriminatory reasons motivated an adverse employment decision, an employer could avoid liability by proving it would have taken the same action even absent the discrimination.  This decision was subsequently codified by Congress in 42 U.S.C. § 2000e-2(m).[10] The United States Court of Appeals for the Third Circuit held in *Watson v. SEPTA*, 207 F.3d 207 (3d Cir. 2000) that § 2000e-2(m) applies only to mixed-motive cases.

As a preliminary matter, the Court notes  the continued existence of the distinction between pretext and mixed-motive cases, a distinction based on the employer's rationale for taking the adverse employment action, even though *Watson* was decided prior to *Desert Palace*.  *See e.g., Makky v. Chertoff*, 541 F.3d 205, 214 (3d Cir. 2008) ("A Title VII plaintiff may state a claim for discrimination under either the pretext theory set forth in [*McDonnell Douglas*], or the mixed-motive theory set forth in [*Price Waterhouse*], under which a plaintiff may show that an employment decision was made based on both legitimate and illegitimate reasons.").[11]

In both pretext and mixed motive cases, the plaintiff employee bears the initial burden to establish a prima facie case that she was discriminated against.[12]  The burden then shifts to the

---

[10]

42 U.S.C. § 20000e-2(m) provides "[e]xcept as otherwise provided in this subchapter, an unlawful employment practice is established when the complaining party demonstrates that race, color, religion, sex, or national origin was a motivating factor for any employment practice, even though other factors also motivated the practice."

[11]

In *Makky*, Justice Samuel Alito writes that "When a plaintiff attempts to prove a discrimination claim under a pretext theory, the *McDonnell Douglas* burden-shifting framework applies. . . .  The *McDonnell Douglas* burden-shifting framework does not apply in a mixed-motive case in the way it does in a pretext case because the issue in a mixed-motive case is not whether discrimination played the dispositive role but merely whether it played 'a motivating part' in an employment decision. It is significant that in *Desert Palace*, the Court omitted any discussion of the *McDonnell Douglas* framework as a requirement in mixed-motive cases." 541 F.3d at 214-15.

[12]As *Makky* exemplifies, the exact nature of the shifting burdens of proof are unclear in a mixed-motive case, though the plaintiff, of course, retains the ultimate burden of persuasion.  541 F. 3d. at 215 ("We need not decide the question whether a plaintiff pursuing a mixed-motive

defendant employer. If the defendant employer claims that there was no discrimination and presents a non-discriminatory reason for the adverse employment action, then the burden shifts back to the plaintiff to show that the defendant's explanation was pretextual, and that is a pretext case. *See McDonnell-Douglas Corp. v. Green*, 411 U.S. 792 (1973); and *Texas Dept. of Comm. Affairs v. Burdine*, 450 U.S. 248 (1981). If the defendant employer instead acknowledges that there was discrimination but presents additional non-discriminatory reasons for the job action, then it is a mixed-motive case. *Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989); *See generally* Matthew R. Scott & Russell D. Chapman, *Much Ado About Nothing–Why* Desert Palace *Neither Murdered* McDonnell Douglas *Nor Transformed All Employment Discrimination to Mixed-Motive*, 36 St. Mary's L.J. 395 (2005) (outlining the continued distinction between pretext and mixed-motive cases).

In this Circuit, in a pretext case, the jury is instructed to find whether improper discrimination was a "determining factor" in the defendant employer's adverse employment action. MODEL CIVIL JURY INSTRUCTIONS § 5.1.2 (3d Cir. 2009). In a mixed-motive case, the jury is instructed that it need only find whether improper discrimination was a "motivating factor" in the adverse employment action. MODEL CIVIL JURY INSTRUCTIONS § 5.1.1 (3d Cir. 2009); *see also Makky 5*41 F.3d at 214-15 ("[T]he issue in a mixed-motive case is not whether discrimination played the dispositive role but merely whether it played 'a motivating part' in an employment decision.").

Practically speaking, the distinction between a pretext case and a mixed-motive case often turns on the strength or type of evidence adduced by the plaintiff employee. So-called "direct evidence" is evidence that is so revealing of discriminatory animus that it is not necessary for the plaintiff to rely on a presumption from her prima facie case to shift the burden of production to the

---

theory of discrimination must satisfy each of the elements of the McDonnell Douglas prima facie case, as that issue is not squarely before us").

defendant. *Starceski v. Westinghouse Elec. Corp.*, 54 F.3d 1089, 1097-98 (3d Cir. 1995). In the face

of such direct evidence, the defendant cannot reasonably argue that there was no discrimination and

therefore the only practical response is to pursue a defense based on a mixed-motive theory. *See*

*Price Waterhouse,* 490 U.S. at 278 (O'Connor, J. concurring and suggesting that the burden to show

a mixed motive should shift to the defendant only when a plaintiff has presented direct evidence).

Alternately, if the initial evidence is not as strong, then the defendant can deny the accusation

altogether, shifting the burden back to the plaintiff to show that the defendant's reason is nothing

more than a pretext.[13]  Regardless of how a plaintiff attempts to establish her case or what types of

evidence she presents, the ultimate question is whether the employer engaged in unlawful

discrimination. *St. Mary's Honor Ctr v. Hicks*, 509 U.S. 502, 519 (1993).

     The holding of *Desert Palace* was that this practicality was not a rule of law: a plaintiff need

not present direct evidence of discrimination in order to obtain a mixed-motive jury instruction.

*Desert Palace*, 539 U.S. at 101-02; *Sosa v. Napolitano* 318 Fed. Appx. 68, 72, 2009 WL 792883,

at *3 (3d Cir. 2009) ("[A] plaintiff who has circumstantial evidence of discrimination may choose

to proceed under either the mixed-motive theory or the burden shifting framework of *McDonnell*

*Douglas*.")

---

[13]

*See* MODEL CIVIL JURY INSTRUCTIONS § 5.1.2 (3d Cir. 2009) cmt. at 10:
While direct evidence is not required to make out a mixed motive case, it is
nonetheless true that the distinction between "mixed-motive" cases and "pretext"
cases is often determined by whether the plaintiff produces direct rather than
circumstantial evidence of discrimination. If the plaintiff produces direct evidence
of discrimination, this may be sufficient to show that the defendant's activity was
motivated at least in part by animus toward a protected class, and therefore a
"mixed-motive" instruction is warranted. If the evidence of discrimination is only
circumstantial, then the defendant can argue that there was no animus at all, and that
its employment decision can be explained completely by a non-discriminatory
motive; it is then for the plaintiff to show that the alleged non-discriminatory motive
is a pretext, and accordingly Instruction 5.1.2 should be given.

However, *Desert Palace* did not do away with the distinction between pretext and mixed-motive cases entirely, only with the gatekeeping question of what sort of evidence was required for each to survive summary judgment.  After *Desert Palace*, the distinction between pretext and mixed-motive cases established by *Hardison* and *Price Waterhouse* and preserved by 42 U.S.C. § 2000e-2(m) lives on and the corresponding jury instructions are still applicable to each.

Thus, the proper question when determining which jury instruction to apply is whether the plaintiff's case is one of pretext or mixed-motive.  After *Desert Palace,* the type of evidence (direct or circumstantial) offered by the plaintiff does not answer this question.  Instead, the Court will look to the substance of the plaintiffs' claims and the evidence presented at trial.  In both of Plaintiffs' complaints, the claim is framed as arising under § 2000e-2(a), not § 2000e-2(m). (Docket No. 1-1 at 2, Docket No 31 at 3).  Although Plaintiffs argue vehemently for the less demanding "motivating factor" instruction, they have not pursued this case as a mixed-motive case, nor has Aldi raised a mixed-motive defense.[14]  Therefore, the Court finds that this is properly considered a pretext case.

Because the Court finds that there was no error in the instruction that the jury consider whether discrimination was a determinative factor in Bloom's termination, Plaintiffs' motion for a

---

[14]

The closest that Plaintiffs came to pressing a mixed-motive case was in their closing argument to the jury, albeit in the form of comment regarding the Court's *determinative* factor instruction:

> Ultimately, we need to show that Kim Bloom's religion or her request for a religious accommodation was a determinative factor.
>
> I have been doing this for a long time. I always grapple with words because they're hard to understand. Couple things in that. The Judge is going to tell you it's a determinative factor, not the sole factor, a factor. What does that mean? Folks, there could be a hundred reasons, there could be a thousand reasons why they decided to do what they did. If just one of them is Kim's religion, if just one of them is the fact that she asked to be accommodated and it made a difference, then we've met our burden.

(Docket No. 179 at 96).  Nonetheless, the jury was not convinced, and one mention of multiple motives in a closing does not constitute presenting a mixed-motive case.

new trial on the basis that the Court committed an error in instructing the jury is denied.

2.      Undue Hardship

Plaintiffs also contend that the Court erred in its instructions to the jury regarding whether Aldi would suffer an undue hardship if required to accommodate Bloom.  Aldi introduced evidence at trial that if it were to accommodate Bloom's religious needs, it would suffer an undue hardship in the form of a loss of employee morale, employees quitting in protest, and subsequent costs for training new employees.  (Docket No. 176, at 74-76; Docket No. 178, at 125, 184),  The Court instructed the jury as follows:

> An accommodation does not result in an undue hardship just because other employees are unhappy about it. An employer does not meet its burden of proving undue hardship merely by showing the accommodation is viewed as bothersome or unfair by other employees.
> An accommodation can result in undue hardship if it would impose unequal treatment on other employees, negatively affect employee morale, diminish efficiency, cause other employees to work a disproportionate workload, and divert them from their regular work.
> However, an employer is not required to deny the shift and job preferences of some employees in order to accommodate or prefer the religious needs of others. Employers are not required to discriminate against some employees in order to enable others to observe their Sabbath.
> A religious accommodation may also create an undue hardship if it imposes more than de minimis financial costs on the employer, for example, if a reasonable accommodation would require the employer to pay overtime costs, extra incentive pay, or to hire another employee. You can consider whether this is or is not an undue hardship in the circumstances of this case.

(Docket No. 179, at 153)

As an initial matter, the Court notes that the jury did not reach the question of undue hardship since they found that Aldi had not failed to reasonably accommodate Bloom's religious beliefs. (Docket No. 160).  The Court is thus inclined to find that any supposed error was therefore harmless. *See Farra v. Stanley-Bostitch, Inc.*, 838 F. Supp. 1021, 1027 (E.D. Pa.,1993) ("As a threshold

matter, a party challenging a jury instruction on a particular matter must establish that the jury in fact reached that matter. A motion for a new trial on issues that a jury did not reach will not be granted."). Though Plaintiffs have not established that the jury did reach the matter, Plaintiffs contend that the error was not harmless since "the language may have prompted the jurors to quickly conclude that it would not be reasonable for an employee to expect an employer to do something it is not obligated to do." (Docket No. 190, at 16).

In *Trans World Airlines v. Hardison*, 432 U.S. 63, 85 (1977), the Supreme Court of the United States held that employers need not offer accommodations that would result in undue hardship in the form of greater than *de minimis* costs or negative effects on other employees. "Both economic and non-economic costs can pose an undue hardship upon employers." *Webb v. City of Philadelphia*, 562 F.3d 256, 260 (3d Cir. 2009). While there is no precise definition of what constitutes 'undue hardship' under Title VII, the United States Court of Appeals for the Third Circuit has consistently stated that "*Hardison* 'strongly suggests that the undue hardship test is not a difficult threshold to pass.'" *Webb*, 562 F.3d at 260 (quoting *United States v. Bd. of Educ. Sch. Dist. of Phila*, 911 F.2d 882, 890 (3d Cir. 1990)).

Determining whether a requested accommodation is an undue hardship is a fact-intensive inquiry that rests on the "particular factual context of each case." *Protos v. Volkswagen of America, Inc.*, 797 F.2d 129, 134 (3d Cir. 1986) (quoting *Tooley v. Martin-Marietta Corp.*, 648 F.2d 1239, 1243 (9th Cir. 1981)). "The magnitude as well as the fact of hardship must be determined by the examination of the facts of each case." *Id.*; *see also Webb,* 562 F.3d at 260. Such a fact intensive determination is best left to a well-instructed jury. *Reeves v. Sanderson*, 530 U.S. at 150-51.

Plaintiffs contend that the second paragraph of the jury charge included above gives Bloom's coworkers a "coworker veto" (Docket No. 190 at 15), allowing the jury to conclude that simple

unhappiness on the part of her coworkers could qualify as an undue hardship.  Plaintiffs are correct that an adverse effect on the interests or happiness of coworkers is not enough to constitute an undue hardship.  *Franks v. Bowman Transp. Co.*, 424 U.S. 747, 774-75 (1976) ("If relief under Title VII can be denied merely because the majority group of employees, who have not suffered discrimination, will be unhappy about it, there will be little hope of correcting the wrongs to which the Act is directed.").

Plaintiffs' challenge to this "employee morale" portion of the instruction, however, is premised upon a reading of the instruction that does not comport with its literal text.  Plaintiffs argue that the instruction was erroneous because it told the jury they could find undue hardship if the Defendant only proved other employees disagreed with allowing the accommodation.  (Docket No 198 at 28).  For this argument to be plausible it is necessary to interpret the instruction as directing the jury that undue hardship can result solely from a negative impact on employee morale.  However, the text of the instruction states that undue hardship can result "if it would impose unequal treatment on other employees, negatively impact employee morale, diminish efficiency, cause other employees to work a disproportionate workload, **and** divert them from their regular work."  (Docket No. 179 at 153) (emphasis added).  Therefore, the literal text of the instruction directed the jurors that negatively impacting morale must be proved with all of the other factors listed in order for the jury to find undue hardship.

The Court recognizes that although a literal reading of the instruction may have required diminished morale to be proved along with the other factors listed in order for undue hardship to be found, this may not have been the jury's understanding of the instruction.  Read colloquially, the instruction could appear to direct the jurors that any one of the factors listed could result in undue hardship.  This reading is supported by the context of the instruction, one paragraph after the jury

was told  that "undue hardship is a hardship that results in more than a minimal cost to the employer." (Docket No. 179 at 152-53).  Any of the factors listed could conceivably result in more than a minimal cost to the employer and, thus, the jury could reasonably have interpreted the instruction as not requiring all of the factors to be present in order to find undue hardship.

However, even read in this manner, as if it directed the jury that they could find undue hardship if employee morale was negatively impacted by an accommodation, the instruction must be considered in its full context. *Boyde v. California*, 494 U.S. 370, 378 (1990).  This portion of the instruction is cast in a different light by the rest of the preceding paragraph, which instructed the jury that "[a]n employer does not meet its burden of proving undue hardship merely by showing the accommodation is viewed as bothersome or unfair by other employees." (Docket No. 179 at 153). When read together these two portions of the instruction directed the jury that they could not find undue hardship if the accommodation was only considered to be bothersome or unfair by other employees, but they could find undue hardship if the accommodation had a more serious negative impact on employee morale.  This is consistent with the Supreme Court's decision in *Hardison* as it has been interpreted by the United States Court of Appeals for the Third Circuit.  *See, e.g.*, *Webb*, 562 F.3d 256.

In *Webb*, the United States Court of Appeals for the Third Circuit found that "[b]oth economic and non-economic costs can pose an undue hardship."  *Webb*, 562 F.3d at 260. The specific examples the *Webb* court gave of non-economic costs that could result in undue hardship were violations of the seniority system of a collective bargaining agreement and the potential threat of criminal sanctions. *Id.*  While the *Webb* court did not explicitly include negative employee morale as an example, nothing suggests the court meant to limit the non-economic costs that could result in undue hardship to the specific examples given.  That the *Webb* Court said that the category of non-

economic costs "includes" certain examples from previous cases does not limit the category to those examples. *Id.* Furthermore, without differentiating between economic and non-economic costs, the court went on to hold the "undue hardship test is not a difficult threshold to pass." *Id.* (internal citation omitted). Thus, it is evident that any non-economic cost that is more than *de minimis* can result in undue hardship.

Plaintiffs argue the Court's instruction contradicts the Supreme Court's holding in *Franks v. Bowman Transp. Co.,* 424 U.S. 747, 774 (1976) that relief under Title VII cannot be denied simply because a majority of employees will be unhappy about the relief granted. However, this Court's instruction specifically stated that "[a]n employer does not meet its burden of proving undue hardship merely by showing the accommodation is viewed as bothersome or unfair by other employees." (Docket No. 179, at 153). Furthermore, the context of the *Franks* decision makes it inapplicable. *Franks*, 424 U.S. 747. *Franks* dealt with the propriety of imposing retroactive seniority relief in order to 'make whole' victims of systematic racial discrimination. *Id.* at 774. As a result, it did not require the Court to perform an undue hardship analysis to determine if religious discrimination exists in the first place, as this case does.

Accordingly, the "employee morale" portion of the undue hardship jury instruction was not erroneous.

Plaintiffs also object to the third paragraph of the undue hardship instruction quoted above, the "job preferences" portion of the instruction, but it too is consistent with the Supreme Court's decision in *Hardison*. The first sentence of the "job preferences" paragraph states "an employer is not required to deny the shift [and] job preferences of some employees in order to accommodate or prefer the religious needs of others." (Docket No. 179, at 153). This is supported by the holding in *Hardison* that TWA was not required to accommodate one employee's desire to observe a Saturday

27

Sabbath by depriving another employee of his shift preference. *Hardison,* 432 U.S. at 81.   The

Supreme Court explicitly found that "Title VII does not contemplate such unequal treatment."   *Id*.

The second sentence of the "job preferences" paragraph stated "[e]mployers are not required

to discriminate against some employees in order to enable others to observe their Sabbath." (Docket

No. 179 at 153).  Almost identical language was used by the *Hardison* Court when it declared, "we

will not readily construe the statute to require an employer to discriminate against some employees

in order to enable others to observe their Sabbath." *Hardison,* 432 U.S. at 85.  Relying on *Hardison*,

courts have consistently held that Title VII does not require an employer to force other employees

to work on a particular day in order to accommodate a specific employee's desire to observe a

religious holiday or Sabbath. *Vaughn v. Waffle House, Inc.*, 263 F. Supp. 2d 1075, 1085 (N.D. Tex

2003); *EEOC v. Bridgestone/Firestone, Inc.*, 95 F. Supp 2d 913, 924 (C.D. Ill. 2000); *Moore v. A.*

*E. Staley Mfg. Co.*, 727 F. Supp. 1156, 1162-63 (N.D. Ill.1989); *EEOC v. Carbie Hilton Int'l*, 597

F. Supp. 1007, 1013 (D. P.R. 1984).

Plaintiffs argue *Hardison* does not control in this case because it was confined to cases where

a religious belief conflicted with a contractually agreed-upon seniority system. (Docket No. 189, at

30).  It is true that the United States Court of Appeals for the Third Circuit has found that "in

[*Hardison's*] central holding, the Court ruled that the reasonable accommodation requirement did

not compel an employer to abrogate a collective bargaining agreement," *Protos v. Volkswagen*, 797

F.2d 129, 133 (3d Cir. 1986), and "the [*Hardison*] opinion stressed the strong national labor policy

favoring enforcement of collective bargaining."  *United States v. Bd. of Educ. for the Sch. Dist. of*

*Philadelphia*, 911 F.2d 882, 887 (3d Cir. 1990).  However, neither case states that the reasoning in

*Hardison* was limited to cases involving collective bargaining agreements or contractually agreed-

upon seniority systems.  In fact, the Court of Appeals for the Third Circuit has consistently applied

*Hardison*'s *de minimis* cost standard for undue hardship to cases dealing with reasonable accommodations of religious practices under Title VII, regardless of  whether they involve contractually agreed-upon seniority systems.  *See e.g. Protos*, 797 F.2d at 133.  Thus, the Third Circuit has not interpreted *Hardison* as being confined to cases where religious belief conflicts with contractually-agreed upon seniority systems. Moreover, similar to the broadly cited portion of the *Hardison* decision establishing the *de minimis* cost  standard, the portions of the *Hardison* decision which support the jury instruction in the present case make no reference to collective bargaining agreements or contractually agreed-upon seniority systems.  *Hardison*, 432 U.S. at 81, 85.

The Court also notes that, although it is non-precedential, the United States Court of Appeals for the Third Circuit's decision in *Aron*–affirming a district court's holding that unequal treatment of other employees and negative impact on employee morale could result in undue hardship–specifically supports the conclusion that undue hardship can take the form of adversely impacting employee morale.  *Aron v. Quest Diagnostics Inc.,* 2006 U.S. App. LEXIS 8106 (3d Cir. April 6, 2006) (not precedential).

Plaintiffs further argue that the "job preferences" portion of the instruction is contradicted by the United States Court of Appeals for the Third Circuit's holding in *Protos* that an employer must "accommodate [plaintiff's] religious practices, but not, for example, the desire of one of her coworkers to spend a particular day with his or her family."  *Protos*, 797 F.2d at 137 (3d Cir. 1986). However, the instruction does not actually contradict the holding.  Simply because an employer is required by law to reasonably accommodate an employee's religious practices but not the non-religious preferences of other employees does not mean that a reasonable accommodation can always override the  job preferences of other employees.  Indeed, as shown above, that type of unequal treatment is precisely what *Hardison* forbade.  *See Hardison,* 432 U.S. at 81.

Accordingly, the "job preferences" portion of the undue hardship jury instruction was not erroneous, and the Plaintiffs' motion for a new trial due to error in the jury instructions is denied.


**V.    CONCLUSION**

For the foregoing reasons, Plaintiff's and Plaintiff-Intervenor's motions for judgment as a matter of law and for a new trial are DENIED.  An appropriate order follows.


*/s Nora Barry Fischer*
Nora Barry Fischer
United States District Judge


cc/ecf:  All Counsel of Record
Dated: September 30, 2009